## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| **GREGORY REICH and** | ) | |
| **LYNN REICH, his wife;** | ) | |
| **Individually, and on behalf** | ) | |
| **of all others similarly situated** | ) | |
| | ) | |
| Plaintiffs**,** | ) | CASE NO. : |
| | ) | |
| **v.** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **GENZYME CORPORATION,** | ) | |
| **THE CEREZYME STAKEHOLDERS** | ) | |
| **WORKING GROUP and** | ) | |
| **EXPRESS SCRIPTS, INC.** | ) | |
| | ) | |
| Defendants**.** | ) | |
| | ) | |

## COMPLAINT

AND NOW come Plaintiffs, through their attorneys, and file this Complaint. In support thereof, Plaintiffs aver:

## PARTIES

1.     Plaintiff DR. GREGORY REICH ("REICH") is an adult individual who resides in Colorado Springs, CO, who has a serious, chronic, and debilitating medical condition, termed Gaucher Disease that requires medical treatment with bi-weekly injections of a drug known as Cerezyme (imiglucerase for injection) ("Cerezyme").  Defendants intentionally interfered with his treatment by illegally and involuntarily substituting an impure and ineffective drug for treatment thereby causing his Gaucher disease to progress causing multiple injuries including development of bone cancer as detailed in this Complaint.

2.     Plaintiff Lynn Reich ("LYNN REICH") is an adult individual who resides in Colorado

1

Springs, CO and is the spouse of GREGORY REICH.

3.      Defendant GENZYME CORPORATION, a Sanofi company, ("GENZYME") is a corporation organized and existing under the laws of the State of Massachusetts, with its headquarters and principal place of business at 500 Kendall Street, Cambridge, MA 02142, and doing business within New York and elsewhere in the United States. Defendant GENZYME CORPORATION is a wholly owned subsidiary of Sanofi, a French Corporation, and is doing business within Colorado, and elsewhere in the United States.

4.      Defendant CEREZYME STAKEHOLDERS WORKING GROUP, ("CSWG") is an instrumentality of GENZYME which is a corporation organized and existing under the laws of the State of Massachusetts, with its headquarters and principal place of business at 500 Kendall Street, Cambridge, MA 02142, and doing business within New York and elsewhere in the United States. Defendant CSWG is wholly organized and controlled by GENZYME and operates business within Colorado, and elsewhere in the United States.

5.      Defendant EXPRESS SCRIPTS, INC., ("EXPRESS SCRIPTS") is a corporation organized and existing under the laws of the State of Delaware, with its headquarters and principal place of business at One Express Way, St. Louis, Missouri 63121 and is doing business within Colorado and elsewhere in the United States.

## JURISDICTION AND VENUE

6.      Jurisdiction is conferred upon this judicial district pursuant to diversity jurisdiction according to 28 U.S.C. § 1332(a)(1) because the Plaintiff is a citizen of a State different from one or more Defendants and the aggregate amount in controversy exceeds seventy five thousand ($75,000), exclusive of interest and costs.  This Court also has diversity jurisdiction over the Classes (as hereinafter defined) under 28 U.S.C. §§ 1332(d) (2) and (6) of the Class Action

Fairness Act of 2005 because one or more members of the Classes are citizens of a State different from one or more Defendants and the aggregate amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs. Joinder is proper under the Rule 20(a)(1)(A) and (B) of the Federal Rules of Civil Procedure, as all injuries arose from a common fact and present a common question of law.

7.      Venue is proper in this Court under 28 U.S.C. § 1391 as this cause of action arose out of acts or omissions within the District of Colorado.

## FACTUAL BACKGROUND

8.      The instant case arises from U.S. Gaucher patients developing cancer and other sequela caused by GENZYME, CSWG and EXPRESS SCRIPTS substituting pure, effective Food and Drug Administration ("FDA") approved doses of Cerezyme with ineffective, experimental, untested, diluted, adulterated medication contaminated by an infectious pathogen.

9.      Gaucher disease, also known as glucocerebrosidase deficiency, is a rare recessively inherited metabolic disorder that results from a genetic deficiency of the lysosomal enzyme acid β-glucosidase, which breaks down glucosylceramide, a key component of the lipid structure of cell membranes.

10.     In individuals with Gaucher disease, glucosylceramide degradation is insufficient, leading to accumulation of large quantities of this lipid within the lysosomes of macrophages (termed 'Gaucher cells'), leading to widespread secondary pathology including hepatosplenomegaly, thrombocytopenia, anemia, and skeletal pathology, such as bone marrow infiltration, osteonecrosis, bone pain and bone crises, osteopenia and osteoporosis, pathological fractures, growth impairment, and multiple myeloma.

11.     Untreated Gaucher patients are at approximately 37.5 fold-increased risk of multiple

myeloma, a form of cancer.  See Mistry, et al. "Gaucher disease: Resetting the clinical and scientific agenda," *See* Mistry, et al. "*Gaucher disease: Resetting the clinical and scientific agenda*," Am J Hematol. 84(4): 205–207 (April, 2009) (http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2999876/).

12.     Treatment with enzyme replacement therapy such as Cerezyme reduces th*e* risk and severity of secondary pathologies from Gaucher including incidence of multiple myeloma. *Id*. "Since its FDA approval in 1994, more than 5,600 patients in 90 countries have been treated with Cerezyme. It is the only therapy with a 17-year history of reducing, relieving and reversing many of the symptoms and risks of Type 1 Gaucher disease." www.cerezyme.com.

13.     Ninety-eight percent of Type I Gaucher disease patients are of Ashkenazi Jewish ethnicity.

14.     Plaintiff REICH is a Gaucher patient of Ashkenazi Jewish descent.

15.     Plaintiff REICH was diagnosed with Gaucher disease over 21 years ago and placed on Cerezyme treatment in 1991 at 60 units//kg injected every two weeks as prescribed and approved by the FDA and which was billed at a rate of over $500,000 per year for treatment.

16.     Once placed on treatment, Gaucher patients are not advised to ever go off enzyme replacement therapy because the disease is progressive.

17.     However, from July, 2009 until September, 2011, Defendants forcibly substituted REICH's intravenous injections of Cerezyme for experimental doses of an untested drug that was intentionally mislabeled, diluted below FDA approved levels, adulterated with glass rubber and steel particles, and contaminated with a viral pathogen known to be dangerous to humans.

18.     An experimental drug is a medicinal product (a drug or vaccine) that has not received approval from governmental regulatory authorities for routine use in human or veterinary

medicine.

19.     Therefore, Cerezyme containing vesivirus, glass, rubber and steel particles, administered at a dose less than 60 units/kg is an experimental drug at reduced strength and having contaminants that have not been approved or even recommended for use to treat Gaucher disease.

20.     Sometime prior to July, 2009, GENZYME contaminated its bioreactors with vesivirus, which caused reduced output.

21.     Due to the viral contamination, GENZYME could not meet customer demand, so it implemented a plan which it designed to "ration" a drug which was, in the first place, illegal to sell and market because the drug was experimental, mislabeled, impure, filth-contaminated, ineffective, diluted, and illegally substituted but marketed as if it were a beneficial treatment for Gaucher disease, despite never having been previously tested in animals, or gravely ill human beings. (*See* Exhibit A, *Revised Guidance to the U.S. Gaucher Community: Management of Cerezyme® (imiglucerase for injection) Supply*, regarding the shortage of Cerezyme)

22.     GENZYME stated that due to the shortage, Cerezyme patients could go without one or two treatments…. It alleged that the missed doses would not cause significant health problems because most patients' bodies have been cleansed of the fatty substances, and it takes more than a few skipped treatments for them to return. *See* Ailworth and Weisman, Boston Globe, "*Virus shuts Genzyme plant, holds up drugs for 8,000*" June 17, 2009 (http://www.boston.com/business/healthcare/articles/2009/06/17/genzyme_temporarily_halts_production_on_2_key_drugs/).   "It is not a life-and-death immediate acute situation we're dealing with here,'' said Henri Termeer, the company's chief executive." *Id.*

23.     Henri Termeer did not disclose in the statement that he holds a degree in economics but

has no medical training.

24.    GENZYME additionally stated that "While the virus [contaminant] has the ability to taint the drugs, it is not considered harmful to humans." *Id*. However, since no research existed on the effects of injecting humans human beings with vesivirus, the statement was materially false and misleading, resulting in the involuntary injection of thousands of patients with the pathogen, and potentially contaminating the global blood supply to the extent such patients donated blood.

25.    In fact, GENZYME is the first organization to conduct medical experimentation on the effects of intravenous vesivirus injections on human beings.

26.    Vesivirus causes infectious disease in humans with observations of viremia, vesicular skin lesions, antigenicity, antibody seroconversion, hepatitis, and potentially inducing spontaneous abortions.  Smith, et al. "*Vesivirus viremia and seroprevalence in humans.*" J Med Virol. 78(5):693-701 (2006); Heetae, et al "*Elevated post-transfusion serum transaminase values associated with a highly significant trend for increasing prevalence of anti-Vesivirus antibody in Korean patients,*" Journal of Medical Virology, 84(12): 1943–1952 (December, 2012).

27.    GENZYME was aware of the dangers of vesivirus prior to its statements to the contrary but decided to involuntarily inject patients with contaminated Cerezyme anyway.  *See*, "*Vesivirus viremia and seroprevalence in humans.*" J Med Virol. 78(5):693-701 (2006) (warning as to the infectious and pathogenic nature of the vesivirus exposure to humans).

28.    GENZYME then contaminated the vials of Cerezyme with glass, rubber and steel particles known to be toxic to humans leading to complications including pulmonary thrombi and micro-emboli, infusion phlebitis, and end-organ granuloma formation and inflammation. See Hegadoren, et al., Journal of Advanced Nursing 48:3, 266 (2004).

29.    GENZYME organized an ad hoc committee, calling it the "Cerezyme Stakeholders

Working Group," to give the appearance of legitimacy to GENZYME's policy of involuntary human experimentation and sale of the untested, virally contaminated, impure and ineffective drug substitute in contravention to the FDA label and doctor's prescriptions for Cerezyme.

30.     The CSWG is solely comprised of GENZYME employees and GENZYME affiliates.

31.     GENZYME did not recognize the CSWG as an authority, but rather considered it a consultant, with final medical authority resting with GENZYME.

32.     GENZYME intended to, and succeed in, inducing reliance on its overriding treatment protocol as acknowledged in its 'Executive Summary - 2009 Business Plan' presented by GENZYME employee Jeanne Penn's slide presentation on August 18, 2009, wherein GENZYME stated "in consultation with key stakeholders, we [Genzyme] worked to develop Cerezyme and Fabrazyme dose conservation guidelines."

33.     The CSWG did not include REICH or the thousands of other patients, nor their legal representatives, their doctors or their rabbinical counsel as the shortage is of particular concern to Jewish patients.

34.     As such, the CSWG was a sham organization solely functioning as an instrumentality of GENZYME, without recognized legal, medical or governmental authority.

35.     Citing the approval of the CSWG, GENZYME then used the "approval" from its sham organization to override multiple safety protocols as well as state and federal statutes designed to protect patients from filthy drugs and involuntary medical experimentation.

36.     Neither GENZYME nor the CSWG sought third party accreditation under FDA regulations for such activities pursuant to 21 U.S.C. § 360(m).

37.     The purpose of the CSWG was to create the illusion that GENZYME's ad hoc medical treatment protocols for Gaucher disease with impure, untested, mislabeled, contaminated and

7

ineffective drug substitute was medically beneficial, despite having no data whatsoever to support such a conclusion and contrary data existing in the medical literature.

38.     For years, GENZYME skipped regular two-week shipments or it shipped one-tenth to one-half of the required number of vials per month, far less than the labeled indication for which the FDA approved distribution of Cerezyme under NDA License No. N020367.

39.     EXPRESS SCRIPTS' wholly owned subsidiary, Accredo Health, distributes Cerezyme and participated in the national sales and marketing of diluted, untested, and ineffective medication substitute by acting as a middle-man identifying which Gaucher patients to target the substitute medication, referring to them as "Group 2" patients—"Group 1" patients received full doses although these patients were also injected with the vesivirus. (*See* Exhibit B, June 30, 2009 Letter from Accredo Health)

40.     To facilitate sales of the impure and ineffective drug, EXPRESS SCRIPTS specifically contacted Gaucher patients' physicians to obtain private patient medical information to target "Group 2" Gaucher patients who would receive diluted medication.

41.     GENZYME and EXPRESS SCRIPTS hypothesized that "Group 2" Gaucher patients would be more resistant to the ill-effects of diluted, adulterated and impure Cerezyme and therefore "Group 2" patients would benefit from the substitution of the drug substitute. This was despite the fact that no legitimate medical authority has ever recognized a sub-group of Gaucher patients as healthy enough to use experimental, diluted, adulterated and contaminated drug substitutions for treatment of Gaucher disease.

42.     According to it's website, Accredo Health represented to patients that it was experienced in Gaucher patient care stating that it "has been working with lysosomal storage disorder (LSD) therapies [such as Gaucher disease] since 1991 and has gained extensive experience that serves

as a valuable resource to their patients."

43.     Patients relied on Accredo Health to protect them from illegal and experimental drug substitutions.

44.     Both GENZYME and EXPRESS SCRIPTS profited from the sale and distribution of the impure and ineffective drug substitute being sold only to "Group 2" Gaucher patients.

45.     GENZYME and EXPRESS SCRIPTS further refused to honor physicians' requests to let "Group 2" patients located in the United States opt out of being injected with the impure, untested, and ineffective substitute medication even after the treating physician determined that a patient was deteriorating and was at a high risk of sequela.

46.     By vetoing U.S. physicians, GENZYME, the CSWG and EXPRESS SCRIPTS assumed the greatest duty because they obviated the physicians' role in making independent medical assessments in treating "Group 2" Gaucher patients, and undertook involuntary medical experimentation on human beings without expert guidance or informed consent.

47.     GENZYME and EXPRESS SCRIPTS did not revise the product labels to indicate that the substitution medication was impure or contaminated or that it was administered at less than the recommended dosage, or warn of any risk of injury from the dilution, adulteration, or contamination.

48.     GENZYME's impure and ineffective drug substitute did not comply with any state or federal drug purity regulation or drug substitution regulation because the drug did not have the strength, quality and purity characteristics it was represented to possess.

49.     GENZYME's impure and ineffective drug substitute did not comply with any state or federal drug safety or drug substitution regulation because the drug was dangerous to health when used in the dosage or with the frequency or duration prescribed, recommended, or

suggested in the labeling.

50.     GENZYME's impure and ineffective drug substitute did not comply with any state or federal drug labeling or drug substitution regulation because the label did not reflect the strength, quality and purity characteristics of the substitute medication being shipped to patients.

51.     GENZYME actively concealed and still conceals reports of injury and death related to the sale and distribution of its impure and ineffective drug substitute.

52.     GENZYME did not obtain informed consent for human testing and administration of the impure and ineffective drug substitute to Gaucher patients.

53.     EXPRESS SCRIPTS classified REICH as a "Group 2" patient and submitted this information to GENZYME.

54.     Subsequently, REICH was sold the impure and ineffective drug substitute for which he and his insurance company paid GENZYME and EXPRESS SCRIPT on at least the following dates: 1/4/2010, 1/11/2010, 1/18/2010, 2/12/2010, 3/23/2010, 4/15/2010, and 3/7/2011.

55.     GENZYME further conducted, collected and authored only the positive medical data it collected on "Group 2" Gaucher patients, but intentionally conceals the negative data collected during the shortage, stating that "Ten years of imiglucerase treatment results in sustainable improvements in all [Gaucher Disease] parameters;" Weinrib, et al. "*Long-term clinical outcomes in type 1 Gaucher disease following 10 years of imiglucerase treatment*," J Inherit Metab Dis 36:543 (2013) (http://www.ncbi.nlm.nih.gov/pubmed/22976765).

56.     Notably, "No data were included after the Cerezyme manufacturing interruption" *Id*.

57.     "Group 2" patients' data is still being collected on the involuntary human medical experimentation to which patients were subjected under the ongoing medical research protocol termed the Gaucher Registry (See http://clinicaltrials.gov/ Identifier: NCT00196742)

58.     GENZYME also maintains an ongoing research protocol termed the 'International Collaborative Gaucher Group' ("ICGG") under United States http://clinicaltrials.gov/ Identifier: NCT00358943, from which GENZYME collects Gaucher Patient Data on the subjects on which it conducted the medical experimentation, but similarly data from the shortage is concealed from patients.

59.     Despite being the responsible party for monitoring Cerezyme research, GENZYME never submitted nor sought approval of the Fabry Disease Registry or ICGG institutional review board to modify or substitute treatment for patients in the clinical trial; nor did it seek consent to modify or substitute treatment for participants; nor has it tried to update participants with the clinical data it has observed from modified and substituted therapy for Cerezyme.

60.     The Defendants conspired to and succeeded in bypassing federal and state programs designed to protect patients from involuntary human medical experimentation, off-label marketing, misbranding, federal and state pure food and drug laws, state therapeutic interchange and substitution laws and state laws banning the corporate practice of medicine and the unauthorized practice of medicine.

61.     REICH's cause of action accrued on June 19, 2012, when he was diagnosed with multiple myeloma.

62.     Due to the conduct of the Defendants, REICH has been subjected to involuntary and illegal human medical experimentation without informed consent, and as a result of the injections and exposure to the impure, unsafe drug substitute.

63.     Due to the conduct of the Defendants, REICH has been deprived of the beneficial treatment recommended by his physician, including, but not limited to, the benefits claimed by Genzyme itself of "reducing, relieving and reversing many of the symptoms and risks of Type 1

11

Gaucher disease." www.cerezyme.com

64.     Due to the conduct of the Defendants, REICH has been subjected to discrimination based on his medical disability.

65.     Due to the conduct of the Defendants, REICH has been intentionally deprived of access to FDA-approved medicine and was instead sold and injected with illegal, dangerous, diluted and impure drug substitutes contaminated with filth and adulterated with particulate matter.

66.     Due to the conduct of the Defendants, REICH has been deprived of autonomy over his own private medical treatment decisions made in consultation with his doctor.

67.      Due to the conduct of the Defendants, REICH has been deprived of Jewish halachic obligation, or the observance of Jewish law, in receiving proper treatment for Gaucher disease to reduce the risk of developing multiple myeloma.

68.     Due to the conduct of the Defendants, REICH has been physically injured having suffered from glucocerebroside deposition, from having developed multiple myeloma, from having had bone deterioration, from having had excisional bone surgery, from having undergone chemotherapy, from having lost the ability to walk without assistance, from having developed skin lesions and from having suffered (and continuing to suffer) chronic pain.

69.     Due to the conduct of the Defendants, REICH has been forced to sell his stake in a private periodontal business depriving him of income therefrom.

70.     Due to the conduct of the Defendants, REICH cannot engage in his periodontal practice depriving him of income therefrom.

## I. APPLICABLE LAWS

71.     Under the Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 331(a)-(c) and (k), the following acts are prohibited: (a) The introduction or delivery for introduction into interstate

commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded;  (b) The adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce; (c) The receipt in interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise; and (k) The alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a food, drug, device, tobacco product, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded.

72.     It is a federal crime to introduce such articles into commerce under 21 U.S.C . § 331 (a) (1) Any person who violates a provision of section 331 of this title shall be imprisoned for not more than one year or fined not more than $1,000, or both. (2) Notwithstanding the provisions of paragraph (1) of this section, 1 if any person commits such a violation after a conviction of him under this section has become final, or commits such a violation with the intent to defraud or mislead, such person shall be imprisoned for not more than three years or fined not more than $10,000, or both.

73.     With regard to the level of required intent, the FDCA is among a type of statutes that "dispenses with the conventional requirement of criminal conduct—awareness of wrongdoing. In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in a responsible relation to a public danger." *U.S. v. Dotterweich*, 320 U.S. 277, 280 (1943). *See also*, *U.S. v. Park*, 421 U.S. 658 (1975) (the FDCA "imposes not only a positive duty to seek out and remedy violations when they occur, but also, and primarily a duty to implement measured that will insure that violations will not occur.")

13

74.    Although physicians may prescribe drugs for off-label usage, the law prohibits drug manufacturers from marketing, promoting, or, as in the instant case, forcing doctors to prescribe an off-label use ostensibly to benefit others. 21 U.S.C. § 356(a).

75.    The FDA also regulates clinical investigations of products under its jurisdiction, such as drugs, biological products, and medical device published in title 21 CFR § 312.

76.    21 CFR § 50.20, Protection of Human Subjects, provides that:

> [n]o investigator may involve a human being as a subject in research covered by these regulations unless the investigator has obtained the legally effective informed consent of the subject or the subject's legally authorized representative. An investigator shall seek such consent only under circumstances that provide the prospective subject or the representative sufficient opportunity to consider whether or not to participate and that minimize the possibility of coercion or undue influence. The information that is given to the subject or the representative shall be in language understandable to the subject or the representative. No informed consent, whether oral or written, may include any exculpatory language through which the subject or the representative is made to waive or appear to waive any of the subject's legal rights, or releases or appears to release the investigator, the sponsor, the institution, or its agents from liability for negligence.

77.    21 CFR § 56 requires that any clinical investigation which must meet the requirements for prior submission (as required in parts 312, 812, and 813) to the FDA shall not be initiated unless that investigation has been reviewed and approved by, and remains subject to continuing review by an Institutional Review Board ("IRB") meeting the requirements of this part.

78.    According to 21 CFR § 56.111, IRB approval is required in order to ensure that:

(1) Risks to subjects are minimized;

(2) Risks to subjects are reasonable in relation to anticipated benefits, if any, to subjects, and the importance of the knowledge that may be expected to result;

(3) Selection of subjects is equitable; and

(4) Informed consent will be sought from each prospective subject or the subject's legally authorized representative, in accordance with and to the extent required by part 50.

14

83.      During the shortage, Genzyme performed medical experimentation on over 8,000 Cerezyme and Fabrazyme patients worldwide without informed consent. By way of comparison, approximately 7,000 Jewish people were used for medical experimentation purposes during World War II in Germany (http://www.ushmm.org/wlc/en/article.php?ModuleId=10005168; www.jewishvirtuallibrary.org/jsource/Holocaust/nazi_experiments.html) and 600 African American experimental subjects were used during the Tuskegee Syphilis Experiments from the 1930-1960's (www.cdc.gov/tuskegee/timeline.htm).

## II. USE OF THE MAIL AND WIRES

84.      Since at least July 2009, the Defendants used thousands of mail and interstate wire communications to create and manage their fraudulent scheme which encompassed countless physicians and victims across the country.

85.      Defendants' use of the mail and wires to perpetrate their fraud involved thousands of communications including:

(a)      Marketing and advertising materials concealing that substitute medication marketed for Gaucher disease was unsafe, improperly labeled and medically ineffective, such materials being sent to doctors and patients across the country;

(b)      Communications, including financial payments and GENZYME-organized but legally unrecognized "working groups" for physicians recommending use of impure and ineffective drug substitutes for Cerezyme that were experimental, unsafe, untested, improperly labeled and medically ineffective, as detailed herein;

(c)      Communications with vendors, doctors and public and private insurers

15

which fraudulently represented that the experimental, impure, mislabeled and ineffective substitute had been previously tested as a safe and effective substitute for medication to treat Gaucher disease and prevent sequela;

(d)     Communications with health insurers, physicians and patients which induced payments for the impure and ineffective drug substitute to be made in reliance on misrepresentations concerning the use of the experimental, impure and ineffective substitute to treat Gaucher disease and prevent sequela;

(e)     Interstate communications extorting *ad terrorem* administration of impure and ineffective substitute medication under GENZYME's veto program which rejected American physician's independent judgment even when the treating physician petitioned GENZYME for prescribed doses due to medical need;

(f)     Interstate communications seeking detailed medical information and private medical details to identify and stratifying patients into the "Group 2" targeted category for sales of the unsafe, ineffective, experimental, contaminated and mislabeled substitute medication for treatment of Gaucher disease and prevention of sequela; and

(g)     Receiving the proceeds of the Defendants' improper schemes.

86.     In addition, each of Defendants' corporate headquarters have communicated by United States mail and by wire with various local district managers, medical liaisons and pharmaceutical representatives in furtherance of Defendants' schemes.

## III. CLASS ALLEGATIONS

87.     Paragraphs 1 through 86 are incorporated hereunder as though fully set forth at length.

88.     Plaintiffs are bringing this action on behalf of themselves and all others similarly situated, which includes any and all individuals residing in the United States who required pure and

effective Cerezyme, and their spouses ("Classes").

89.     The proposed Classes are so numerous that joinder of all members of the Classes is

impractical and the administration of the claims as set forth on behalf of the Classes is more

efficient and will benefit the parties and the Court.

90.     The questions of law and fact common to the Classes predominate over the questions

affecting only individual members of the Classes.

91.     Plaintiffs' claims as set forth are typical of the claims of the Classes and their

subrogators, as they have all suffered a similar harm because of the Defendants' actions and

omissions.

92.     Plaintiffs will fairly and adequately represent and protect the interests of the members of

the Classes and their subrogators because their interests do not conflict with the interests of the

individual members of the Classes or their subrogators. Plaintiffs have retained competent and

experienced counsel to represent themselves and the members of the Classes.

93.     Adjudication of the claims set forth herein as a class action is superior to individual

litigation of the claims, which would be impractical, expensive, and unduly burdensome to the

Court.

## COUNT I: NEGLIGENCE

**GREGORY REICH, his subrogators, and all others similarly situated v.
GENZYME, CSWG and EXPRESS SCRIPTS**

94.     Paragraphs 1 through 93 are incorporated hereunder as though fully set forth at length.

95.     The injuries sustained by Plaintiffs were due to and were the direct and proximate result

of the negligence, carelessness and recklessness of Defendant GENZYME generally, and

under the following particulars:

a.      in that Defendants marketed, distributed and sold impure and ineffective drug substitutes for treatment of Gaucher disease and prevention of sequela, which Defendants realized was done dangerously, heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the Plaintiffs,

b.      in that Defendants marketed, distributed, and sold vials adulterated with dangerous, infectious, and immunogenic virus, as well as filth including glass, rubber and steel particles as well as diluting the dose below therapeutic levels such that the drug was too harmful to be used by anyone, with actual and constructive knowledge;

c.      in that Defendants instructed and through knowledge and consent marketed, distributed, and sold impure and ineffective drugs substitutes to Americans based on discriminatory bases, including protected classes of medical disability, citizenship, private medical information and ethnicity, whereby making them the subjects of involuntary medical experimentation.

d.      in that Defendants barred physicians from administering the prescribed and lawful recommended doses of Cerezyme in accordance with the indications of the product insert and instead substituted an illegal, experimental, diluted, untested, adulterated, misbranded, and contaminated product that is of no known therapeutic benefit as an approved equivalent for an effective and pure prescription Cerezyme;

e.   in that Defendants failed to test or require testing the effects of experimental, impure and ineffective drug substitutes to treat Gaucher disease or report such effects when administered to humans;

f.   in that Defendants failed to provide adequate warnings, cautions, and directions concerning the dangers and limitations of impure and ineffective drug

18

substitutes which they observed or foresaw;

g.  in otherwise failing to exercise the care and caution that a reasonable, careful, and prudent entity would have, or should have, exercised under the circumstances;

h.  In that Defendant violated the following statutes, giving rise to negligence per se:

i.  The Food, Drug and Cosmetic Act 21 U.S.C. §351(a)-(d) regarding adulterated products;

ii.  21 USC § 352(f) regarding adequate warning and labeling;

iii. 21 U.S.C. § 355(j) regarding the statutory approval process for testing of previously unapproved doses;

iv.  21 U.S.C. § 356(a) regarding testing required for substantial manufacturing changes;

v.  the individual state statutes protecting Plaintiffs from adulterated or misbranded drugs because the dosages being shipped did not comply (nor were even intended to comply) with FDA approval or labeling when the drug left the control of the manufacturer or seller under Colorado Food and Drug Act CRS § 25-5-401 et seq.;

vi.  the individual state statutes barring corporate practice of medicine (CRS §§ 12–36–117(1)&(m) and 25–3–103.7) and unauthorized practice of medicine in prescribing medicines not of the same dose, purity and identity as a physician-authorized refill (C.R.S. §12–36–106);

vii.  the prohibitions of conducting involuntary medical testing on human beings:

19

a) In that risks to "Group 2" experimental patients were not minimized:

b) In that the benefits to "Group 2" experimental patients were not reasonably in relation to the anticipated benefits to the extent any existed

c) In that the selection of "Group 2" experimental patients was not equitable and, instead, discriminatory against U.S. treated "Group 2" patients being subject to a corporation's veto of a physician mandate of access; and

d) In that "Group 2" patients did not grant informed or effective consent for administration and were involuntarily forced into illegal human medical experimentation, and

viii. the Equal Protections clause of the United States Constitution.

96.    As a direct and proximate result of Defendant's willful and wanton conduct, as set forth above, and reckless indifference to Plaintiffs' health and interests, Plaintiffs have sustained, or are at imminent risk of sustaining, the following serious injuries consistent with deterioration of disease, some or all which may be of a permanent nature: cancer, bone injury, neurological injury, peripheral pain, hepatitis, viremia, anaphylaxis and premature death and other serious and permanent injuries.

97.    As a direct and proximate result of the aforesaid injuries, Plaintiffs have been damaged as follows:

a.  Plaintiffs have been and will be required to expend large sums of money for medical and surgical attention, medical and surgical supplies, medical and surgical

20

appliances and medicines;

      b.    Plaintiffs have suffered and will continue to suffer great pain, suffering, inconvenience, impairment of bodily function and mental anguish;

      c.    Plaintiffs have been and will be deprived of earnings and earning capacity;

      d.    Plaintiffs have suffered loss of enjoyment of life;

      e.    Plaintiffs have died or suffered a reduced life expectancy; and

      f.    Plaintiffs' general health, strength and vitality have been impaired.

WHEREFORE, Plaintiff GREGORY REICH, individually and on behalf all others similarly situated demand judgment against Defendants in an amount in excess of $75,000.00, together with costs of suit and exemplary damages as applicable, and hereby demand a trial by jury of all issues so triable.

## <u>COUNT II: NEGLIGENCE *PER SE*</u>

**GREGORY REICH, his subrogators, and all others similarly situated v.**
**GENZYME, CSWG and EXPRESS SCRIPTS**

98.    Paragraphs 1 through 97 are incorporated hereunder as though fully set forth at length.

99.    Defendants are liable for the severe injuries and conditions of REICH and all others similarly situated as set forth herein in Count I by virtue of the negligence per se including the knowing and intentional substitution of a contaminated, adulterated, diluted, untested, mislabeled product in lieu of the  medically prescribed, FDA-approved, pure and undiluted Cerezyme in contravention to Colorado Pure Food and Drug Law § 25-5-401,

100.    Defendants knew the experimental drug substitution was done dangerously, heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the Plaintiffs,

101.    As a direct and proximate result of the aforesaid injuries, REICH and all others similarly situated have suffered damages as set forth herein in Count I.

WHEREFORE, Plaintiff GREGORY REICH, individually and on behalf all others similarly situated demand judgment against Defendants in an amount in excess of $75,000.00, together with costs of suit and exemplary damages as applicable, and hereby demands a trial by jury of all issues so triable.

## COUNT III: STRICT LIABILITY

### GREGORY REICH, his subrogators, and all others similarly situated v. GENZYME, CSWG and EXPRESS SCRIPTS

102.    Paragraphs 1 through 101 are incorporated hereunder as though fully set forth at length.

103.    Defendants are strictly liable to Plaintiffs as follows:

a.    for failure to adequately and safely label the experimental, impure and ineffective drug substitute for treatment of Gaucher disease and  prevention of sequela;

b.    for distributing and selling an experimental, impure and ineffective drug substitute for treatment of Gaucher disease and prevention of sequela, which Defendants realized was done dangerously, heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the Plaintiffs;

c. for distributing and selling the experimental, impure and ineffective drug substitute for treatment of Gaucher disease and prevention of sequela in a  defective dosage and condition being  adulterated with vesivirus pathogen, glass, rubber and steel particles;

d. for distributing and selling the experimental, impure and ineffective drug substitute for treatment of Gaucher disease and prevention of sequela when the drug was

untested and unreasonably dangerous for its intended use; and

e. for failure to give adequate and complete warnings of the known or knowable dangers involved in using an experimental, impure and ineffective drug substitute for treatment of Gaucher disease and  prevention of sequela.

f. for causing patients to be injected with an impure and ineffective drug substitute for treatment of Gaucher disease and prevention of sequela without prior testing and without obtaining informed consent of such patients.

104.   By virtue of the strict liability of Defendants, Defendants are liable for the severe injuries and conditions suffered by Plaintiff REICH and on behalf of all others similarly situated as set forth herein in Count I.

WHEREFORE, Plaintiff GREGORY REICH, individually and on behalf all others similarly situated demand judgment against Defendants in an amount in excess of $75,000.00, together with costs of suit and exemplary damages as applicable, and hereby demands a trial by jury of all issues so triable.

## COUNT IV: BREACH OF WARRANTY

**GREGORY REICH, his subrogators, and all others similarly situated v. GENZYME, CSWG and EXPRESS SCRIPTS**

105.   Paragraphs 1 through 104 are incorporated hereunder as though fully set forth at length.

106.   All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendant GENZYME's breach of express and implied warranties of merchantability or fitness for the intended use to treat Gaucher disease and prevent sequela, in the following particulars:

a.  that Defendants expressly warranted in the product insert that the substitute

drug being shipped and distributed 'reduces glucosylceramide deposition' despite never having tested whether the product and inconsistent dosing actually reduces such deposition and having observed the contrary for the substitute doses;

b.      that Defendants expressly warranted in the product insert that the experimental substitute dose was indicated for use to treat Gaucher disease and prevent sequela, despite never having obtained FDA approval for using such a substitution for treating Gaucher disease;

c.      that Defendants failed to adequately, properly and timely test the e x p e r i m e n t a l  substitute dose prior to use;

d.      that the substitute doses being adulterated with glass, steel, and rubber particles, as well as contaminated with vesivirus and not intended for use at the strength stated in the label, is not fit for the ordinary purpose for which it is customarily or foreseeably used;

e.      that Defendants knew or should have known that the experimental impure and ineffective drug substitute is dangerous and likely to cause damage to users;

f.      that the impure and ineffective drug substitute was not in conformity, where safety is concerned, with products used in a normal course of business and statutory mandates;

g.      that Defendants knew or should have known that to make the drug substitute effective for its intended use, they should have shipped and distributed the drug at the recommended dose;

h.      that Defendants knew or should have known, that due to the inherently dangerous nature of the design of the dosing schedule and the drug adulteration, they

24

should have provided warnings on the product to protect users and provide a basis for informed consent prior to injection;

i.   that Defendants did not keep abreast of updates in medical science and knew of adverse events involving the impure and ineffective drug substitute but failed to warn users;

j.   that Defendants did not disclose to the users of the experimental, impure and ineffective drug substitute it was defectively and unreasonably designed, thereby making the product dangerous to use;

k.   that Defendants included an incorrect and unapproved product insert because Defendants did not, and would not, allow physicians to treat patients with the recommended dose for which the insert was intended;

l.   that Defendants knew or should have known that users were relying upon the expertise of the Defendants in designing, fabricating, manufacturing, testing, labeling and supplying the impure and ineffective drug substitute;

m.   that Defendants affirmatively represented that the drug given at full dosage would be sold to citizens at various dates, but breached such promises repeatedly since June, 2009;

n. that Defendants expressly and impliedly warranted that the experimental impure and ineffective drug substitute was approved for use by the FDA and efficacious for the treatment of Gaucher disease and prevention of sequela; and

o. that Defendants expressly and impliedly misrepresented that the impure and ineffective drug substitute was approved for by the FDA and efficacious for the treatment of Gaucher disease and prevention of sequela.

25

107.   By virtue of the breach of warranty, Defendants are liable for the severe injuries and conditions of GREGORY REICH and all others similarly situated as set forth herein in Count I.

108.    As a direct and proximate result of the aforesaid injuries, GREGORY REICH and all others similarly situated have suffered damages as set forth herein in Count I.

WHEREFORE, Plaintiff GREGORY REICH, individually and on behalf all others similarly situated demand judgment against Defendants in an amount in excess of $75,000.00, together with costs of suit and exemplary damages as applicable, and hereby demands a trial by jury of all issues so triable.

## COUNT V: TORTIOUS INTERFERENCE WITH A PHYSICIANS/PATIENT RELATIONSHIP

**GREGORY REICH, his subrogators, and all others similarly situated v. GENZYME, CSWG and EXPRESS SCRIPTS**

109.   Paragraphs 1 through 108 are incorporated hereunder as though fully set forth at length.

110.   REICH and all others similarly situated entered into a physician/patient relationship with treating physicians for the treatment of Gaucher disease and prevention of sequela.

111.   The Defendants have actual knowledge of the physician/patient relationship.

112.   The Defendants have intentionally and without justification interfered with and exploited these physician/patient relationships in order to force sales of the impure and ineffective drug substitute counter to the independent judgment of patient's physicians:

(a)      In that the Defendants unilaterally devised and implemented a plan and strategy for obtaining data from physicians to the detriment of the physicians' patients by forced sale of the impure and ineffective drug substitute, termed "Group 2" classified patients;

(b)      In that the Defendants barred physicians from administering the prescribed

26

treatment of Gaucher patients by refusing to honor and distribute authorized state medical prescriptions or physician petitions for access where their patients were classified as "Group 2";

(c)     In that the Defendants denied and interfered with the benefits of the physician/patient relationship to REICH and all others similarly situated.

113.   By virtue of the tortious interference as set out above, the Defendants have caused damages to REICH and all others similarly situated and are liable for the severe injuries and conditions as set forth in Count I .

114.   As a direct and proximate result of the aforesaid injuries, REICH and all others similarly situated have suffered damages as set forth herein in Count I.

WHEREFORE, Plaintiff GREGORY REICH, individually and on behalf all others similarly situated demands judgment against Defendants, GENZYME, CSWG and EXPRESS SCRIPTS, in an amount over $75,000.00, together with costs of suit and exemplary damages as applicable, and hereby demands a trial by jury of all issues so triable.

## COUNT VI (RICO)
Violation of 181 U.S.C. § 1962(c) (The "CSWG Enterprise")
### GREGORY REICH, his subrogators, and all others similarly situated v. GENZYME, CSWG and EXPRESS SCRIPTS

115.   Paragraphs 1 through 114 are incorporated hereunder as though fully set forth at length.

116.   Defendants' motive in creating and operating the fraudulent scheme and RICO enterprises, described hereinafter, was to fraudulently obtain revenues from marketing illegally substituted, impure and ineffective medication while representing to the public that the substitute medications were an effective and safe alternate to treat Gaucher disease and the prevention of sequela.

27

117.    The Defendants are a "person" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

118.    The CSWG is an "enterprise" which was created and/or used as a tool to effectuate Defendants' pattern racketeering activity; the CSWG Enterprise is, in-fact, associated with GENZYME.

119.    The CSWG Enterprise engaged in and affected interstate commerce in that GENZYME created CSWG as a committee to justify and require the purchase of an experimental, impure and ineffective drug substitute for Gaucher treatment administered to thousands of individuals throughout the United States, and GENZYME and EXPRESS SCRIPTS then relied on the ostensible independent recommendations of the CSWG.

120.    Defendant GENZYME has exerted control over the CSWG Enterprise, and Defendants have participated in the operation or management of the affairs of the CSWG Enterprise, through the following actions:

        (a) Defendants have asserted direct control over the information and content disseminated to the vendors, the government, doctors, patients and the public regarding the medical safety and efficacy of impure and ineffective drug substitute for Cerezyme treatment across the country; and

        (b) Defendants have placed their own employees and agents in positions of authority and control within the CSWG Enterprise.

121.    Defendants have conducted and participated in the affairs of the CSWG Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. § § 1341 and 1343 (mail and wire fraud), as described above.

28

122.    In implementing their fraudulent scheme, Defendants knew that patients and their subrogators and other healthcare providers depended on the honesty of Defendants in representing medical safety and efficacy of the impure and ineffective drug substitute for Cerezyme treatment, particularly when administered in contravention to the FDA-approved label.

123.    Defendants' fraudulent scheme comprised of, inter alia:

(a) causing health care providers to misrepresent the use(s) for which an impure and ineffective drug substitute was being provided as off-label and experimental;

(b) deliberately misrepresenting the impure and ineffective drug substitute was both safe and effective so REICH and other patients and their subrogators paid for this drug despite Defendants' awareness that it was not in actuality safe and effective or approved for any use, medical or otherwise;

(c) publishing or causing to have published materials containing false information upon which REICH, other patients, physicians, patient insurers and other healthcare providers relied upon when choosing to prescribe or pay for the experimental, impure and ineffective drug substitute;

(d) forcing patients and their subrogators to purchase the impure and ineffective drug substitute by refusing to honor physician prescriptions and independent judgment; and

(e) actively concealing, and causing others to conceal, information about the true safety and efficacy of the experimental, impure and ineffective drug substitute.

124.    Defendants' scheme was calculated to ensure that REICH and other patients and their subrogators would pay for the experimental, impure and ineffective drug substitute as if the drug

was safe, effective and being administered according to the FDA labeling requirements.

125.    Each of Defendants' fraudulent mailings and interstate wire transmissions constitute "racketeering activity'' within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

126.    The above-described racketeering activities amounted to a common course of conduct intended to deceive.  Defendants' criminal acts of racketeering had the same pattern and similar purpose of defrauding patients and their subrogators. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs.

127.    The pattern of racketeering activity and the CSWG Enterprise are separate and distinct from each other.

128.    Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the CSWG Enterprise.

129.    These predicate acts are related because they had the same purpose, results, victims and methods of commission.

130.    The acts also pose a threat of continued criminal activity because the scheme has existed for several years and the European Medicines Agency (http://www.ema.europa.eu/ema/ ) reports that Cerezyme is still under threat of shortage since the supply chain is fragile as of the date of this filing.

131.    REICH and other patients and their subrogators have been injured in their property by these violations because Defendants have made millions of dollars in fraudulently obtained payments for the experimental, impure and ineffective drug substitute.

132.    REICH and other patients and their subrogators have relied to their detriment on

Defendants' fraudulent misrepresentations and omissions.

133.    REICH and other patients' injuries were directly and proximately caused by Defendants'

racketeering activity as described above.

134.    By virtue of the violations of 18 U.S.C. § 1962(c), Defendants are liable jointly and

severally for three times the damages sustained, plus the cost of this suit, including reasonable

attorneys' fees.

## COUNT VII (RICO)

Violation of 181 U.S.C. § 1962(c) (The "GROUP 2 Enterprise")

**GREGORY REICH, his subrogators, and all others similarly situated v.
GENZYME, CSWG and EXPRESS SCRIPTS**

135.    Paragraphs 1 through 134 are incorporated hereunder as though fully set forth at length.

136.    Defendants' motive in creating and operating the fraudulent scheme and RICO

enterprises described herein was to fraudulently obtain revenues from marketing illegally

substituted impure and ineffective medication while representing to the public the substitute

medications were an effective and safe substitute to treat Gaucher disease and prevention of

sequela.

137.    The Defendants are a "person" within the meaning of § 1961(3) who conducted the

affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §

1962(c).

138.    The organization creating 'GROUP 2' is an "enterprise" which was created and/or used

as a tool to effectuate Defendants' pattern racketeering activity and enterprise being in-fact

associated with the Defendants, GENZYME, CSWG and EXPRESS SCRIPTS.

139.    The GROUP 2 Enterprise engaged in and affected interstate commerce in that the

Defendants proposed using, and did use, the unlawfully solicited patient medical data to classify

31

patients into an experimental treatment "Group 2" for sale of an experimental, impure and ineffective drug substitute to be administered intravenously to thousands of individuals throughout the United States.

140.    Defendants have exerted control over the GROUP 2 Enterprise, and Defendants have participated in the operation or management of the affairs of the GROUP 2 Enterprise, through the following actions:

> (a) Defendants have asserted direct control over the information and content disseminated to the vendors, the government, doctors, patients and the public regarding the medical safety and efficacy of impure and ineffective drug substitute for Cerezyme treatment across the country; and

> (b) Defendants have placed their own employees and agents in positions of authority and control within the GROUP 2 Enterprise.

141.    Defendants have conducted and participated in the affairs of the GROUP 2 Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. § § 1341 and 1343 (mail and wire fraud), as described above.

142.    In implementing their fraudulent scheme, Defendants knew that patients and their subrogators and other healthcare providers depended on the honesty of Defendants in representing medical safety and efficacy of the experimental, impure and ineffective drug substitute for Cerezyme treatment, particularly when administered in contravention to the requirements of the FDA-approved label and against the treating physician's recommendations.

143.    As detailed above, Defendants' fraudulent scheme consisted of, inter alia:

> (a) causing health care providers to misrepresent the use(s) for which the impure and ineffective drug substitute was being provided as off-label and experimental;

32

(b) deliberately misrepresenting the experimental, impure and ineffective drug substitute was both safe and effective so REICH and other patients and their subrogators paid for this drug despite Defendants' awareness that it was not in actuality safe, effective or even previously tested;

(c) publishing or causing to have published materials containing false information upon which REICH, other patients, physicians, patient insurers and other healthcare providers relied upon when choosing to prescribe or pay for the impure and ineffective drug substitute;

(d) forcing patients and their subrogators to purchase the impure and ineffective drug substitute by refusing to honor physician recommendations; and

(e) actively concealing, and causing others to conceal, information about the true safety and efficacy of the impure and ineffective drug substitute.

144.   Defendants' scheme was calculated to ensure that REICH and other patients and their subrogators would pay for the impure and ineffective drug substitute as if the experimental drug was safe, effective and was being administered according to the FDA labeling requirements.

145.   Each of Defendants' fraudulent mailings and interstate wire transmissions constitute "racketeering activity'' within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

146.   The above described racketeering activities amounted to a common course of conduct intended to deceive because the Defendants' criminal acts of racketeering had the same pattern and similar purpose of defrauding patients and their subrogators. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs.

147.    The pattern of racketeering activity and the GROUP 2 Enterprise are separate and distinct from each other.

148.    Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the GROUP 2 Enterprise.

149.    These predicate acts are related because they had the same purpose, results, victims and methods of commission.

150.    The acts also pose a threat of continued criminal activity because the scheme has existed for several years and the European Medicines Agency (http://www.ema.europa.eu/ema/ ) reports that Cerezyme is still under threat of shortage since the supply chain is fragile as of the date of this filing.

151.    REICH and other patients and their subrogators have been injured in their property by these violations because Defendants have made millions of dollars in fraudulently obtained payments for the experimental, impure and ineffective drug substitute.

152.    REICH and other patients and their subrogators have relied to their detriment on Defendants' fraudulent misrepresentations and omissions.

153.    REICH and other patients and their subrogators have relied to their detriment on Defendants' fraudulent misrepresentations and omissions in selling impure and ineffective drug substitute and vetoing doctor's recommendations of reinstituting FDA approved treatment of Cerezyme.

154.    REICH and other patients' injuries were directly and proximately caused by Defendant's racketeering activity as described above.

155.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable jointly and severally for three times the damages sustained, plus the cost of this suit, including reasonable

attorneys' fees.

### COUNT VIII: INTENTIONAL/NEGLIGENT MISREPRESENTATION

**GREGORY REICH, his subrogators, and all others similarly situated v.
GENZYME, CSWG and EXPRESS SCRIPTS**

156.    Paragraphs 1 through 155 are incorporated hereunder as though fully set forth at length.

157.    GREGORY REICH, his subrogators, and all others similarly situated were induced to pay for an impure and ineffective drug substitute by GENZYME and EXPRESS SCRIPTS' assertions that the substitute would be effective and safe to treat Gaucher disease and having been certified for such use by GENZYME'S appointed panel of doctors and EXPRESS SCRIPTS' representation of experience in treatment for Gaucher disease patients.

158.    Defendants knew or should have known that the impure and ineffective substitute was dangerous and conferred no benefit to REICH or any other "Group 2" classified patients having mislead and concealed the true nature and medical risks of the impure and ineffective drug substitute.

159.    Defendants made such representations despite knowing the falsity and inaccuracy of such representations and having concealed medical information to the contrary.

160.    REICH, his subrogators, and all others similarly situated justifiably relied on Defendants' misrepresentations.

161.    As a direct and proximate result of the aforesaid injuries, REICH, his subrogators and all others similarly situated have suffered damages as set forth in Count I, *supra*.

WHEREFORE, Plaintiff GREGORY REICH, individually and on behalf all others similarly situated demands judgment against Defendants, GENZYME, CSWG and EXPRESS SCRIPTS, in an amount over $75,000.00, together with costs of suit and exemplary damages,

and hereby demands a trial by jury of all issues so triable.

## COUNT IX: COLORADO CONSUMER PROTECTION ACT VIOLATION

(CRS § 6-1-101 et seq.)

**GREGORY REICH, his subrogators, and all others similarly situated v.
GENZYME, CSWG and EXPRESS SCRIPTS**

162.   Paragraphs 1 through 161 are incorporated hereunder as though fully set forth at length.

163.   All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendant GENZYME's deceptive acts or practices regarding the sale and use of an impure and ineffective substitute for treatment of Gaucher disease and prevention of sequela, generally, and in the following particulars:

a.   in intentionally failing to inform Plaintiffs and the public that the dosage given was unapproved and unauthorized and of the possible consequences of such unapproved and unauthorized use;

b.   in affirmatively representing that the experimental, impure and ineffective substitute drug would successfully treat Gaucher disease and prevent sequela such that Gaucher disease patients would benefit from a diluted dose;

c.   in willfully placing a misleading and incorrect label with the product since the Defendants banned all Group 2 patients in the U.S. from receiving the FDA approved strength and purity as detailed in the label;

d.   in barring Colorado physicians from administering the prescribed and lawful recommended drug instead of the experimental impure and ineffective substitution and barring "Group 2" patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert;

36

e.   in vetoing Colorado physicians' requests to administer the prescribed and

lawful recommended drug instead of the experimental, impure and ineffective

substitution to "Group 2" patients; and

f.   in expressly or impliedly misrepresenting that the impure and ineffective drug

substitution was provided in accordance with statutory mandates and was safe and

effective in treating Gaucher disease and preventing sequela despite having

overwhelming knowledge to the contrary.

164.   By the use of deceptive trade practices, REICH, his subrogators and all others similarly

situated have suffered damages as set forth in Count I.

WHEREFORE, Plaintiff GREGORY REICH, individually and on behalf all others

similarly situated demands judgment against Defendants, GENZYME, CSWG and EXPRESS

SCRIPTS, in an amount in excess of $75,000.00, exemplary damages together with costs of suit

as applicable, and hereby demands a trial by jury of all issues so triable.

## <u>COUNT X: UNJUST ENRICHMENT</u>

**GREGORY REICH, his subrogators, and all others similarly situated v.
GENZYME, CSWG and EXPRESS SCRIPTS**

164.   Paragraphs 1 through 163 are incorporated hereunder as though fully set forth at length.

165.   GREGORY REICH, his subrogators, and all others similarly situated have conferred a

benefit to GENZYME and EXPRESS SCRIPTS by purchasing the impure and ineffective drug

substitute for treatment of Gaucher disease and prevention of sequela.

166.   Defendants have retained that benefit despite having conferred no benefit and instead a

detriment to REICH, his subrogators and all other similarly situated, based on the Defendants'

acts which mislead patients and concealed the true nature and medical risks of the impure and

37

ineffective drug substitute.

167.     Given the facts alleged, it would be unjust to allow the Defendants to retain the benefits of the sale and distribution of the impure and ineffective drug substitute.

169.     As a direct and proximate result of the aforesaid injuries, REICH and all others similarly situated have suffered damages as set forth herein in Count I.

WHEREFORE, Plaintiff GREGORY REICH, individually and on behalf all others similarly situated demands judgment against Defendants, GENZYME, CSWG and EXPRESS SCRIPTS, in an amount in excess of $75,000.00, exemplary damages together with costs of suit as applicable, and hereby demands a trial by jury of all issues so triable.

## COUNT XI: LOSS OF CONSORTIUM

### LYNN REICH, and all others similarly situated v.
### GENZYME, CSWG and EXPRESS SCRIPTS

170.     Paragraphs 1 through 169 are incorporated as if set forth fully at length herein.

171.     At all times material hereto, GREGORY REICH was lawfully married to LYNN REICH.

172.     As a direct and proximate result of the injuries sustained by his spouse, LYNN REICH has been damaged as follows:

(a) LYNN REICH has been, and will continue to be, compelled to expend large sums of money for medical care, supplies, appliances and medicine;

(b) LYNN REICH has been, and will continue to be, compelled to expend large sums of money hiring help to perform household duties previously performed by her spouse, GREGORY REICH; and

(c) LYNN REICH has been, and will continue to be, deprived of her spouse's aid, comfort, assistance, companionship, society, attentions and consortium.

38

WHEREFORE, LYNN REICH demands judgment against Defendants in an amount in excess of $75,000.00, together with costs of suit and exemplary damages as applicable and demands a trial by jury of all issues so triable in this cause.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

a.   Certification of this action or common issues herein as a class action;

b.   A determination of common issues and claims in a unitary, consolidated or class- wide trial pursuant to Fed. R. Civ. P. 23 and/or Fed. R. Civ. P 42;

c.   An award of compensatory damages to each injured class member in an amount deemed appropriate by the trier of fact;

d.    An award of punitive damages for acts and omissions of Defendants found to be willful and wanton, outrageous, and made with reckless indifference to Plaintiffs' lives, health and interests;

e. An award of compensatory, equitable and/or restitutionary damages according to proof and for all applicable damages, remedies, and relief under applicable federal and state statutes;

f. An award of costs of suit; and

g. Any other legal and/or equitable relief to which Plaintiffs might be entitled at law or which this Court deems proper.

## JURY TRIAL DEMANDED

Respectfully submitted,

Plaintiffs, by their Attorney,

By:      s/ Rachel J. Goldfarb

Rachel J. Goldfarb
CO Attorney Registration No. 46658
The Bell Law Firm, PLLC
1745 Shea Center Drive
Highlands Ranch, CO 80129
720.344.4899