IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-01684-RM-MJW

GREGORY REICH and
LYNN REICH, his wife;
Individually, and on behalf of all others similarly situated,

Plaintiffs,

v.

GENZYME CORPORATION,
ACCREDO HEALTH GROUP, and
CURASCRIPT, INC.,

Defendants.

---

## RECOMMENDATION ON
## ACCREDO HEALTH GROUP, INC. AND CURASCRIPT, INC.'S RULE 12(B)(6) MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT (Docket No. 43) and DEFENDANT GENZYME CORPORATION'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6) (Docket No. 44)

---

**MICHAEL J. WATANABE**
**United States Magistrate Judge**

This case is before this court pursuant to Orders Referring Case issued by Judge

Raymond P. Moore on June 18, 2014 (Docket No. 4), and December 19, 2014 (Docket

No. 57).

Now before the court for a report and recommendation are two dispositive

motions, Accredo Health Group, Inc. and Curascript, Inc.'s Rule 12(b)(6) Motion to

Dismiss Plaintiffs' Amended Complaint (Docket No. 43) and Defendant Genzyme

Corporation's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) (Docket No. 44)

(including a Declaration of attorney Christopher M. Strongosky and exhibits (Docket No.

45)).  Plaintiffs filed responses to the motions (Docket Nos. 49 and 50), and defendants filed replies (Docket Nos. 51 and 52).  In addition, supplemental briefing/notice of authorities were subsequently filed (Docket Nos. 61, 62, 63, 68, and 70).  The court heard oral argument on June 30, 2015 (see Docket No. 71).  The court has carefully considered all of these motions papers, oral argument of counsel, and applicable Federal Rules of Civil Procedure and case law.  In addition, the court has taken judicial notice of the court file.  The court now being fully informed makes the following findings and conclusions of law, and substantially for the reasons stated in the motions to dismiss, which are incorporated herein, recommends that both motions be granted.

## PLAINTIFFS' ALLEGATIONS

The convoluted, verbose Amended Complaint (Docket No. 31) is not a model pleading.  After re-reading it numerous times, the court has gleaned the following allegations from that pleading and referenced attachments.  The plaintiffs are Dr. Gregory Reich and his wife, Lynn Reich, who brings a derivative consortium claim. Gregory Reich has a chronic, debilitating medical condition, Gaucher Disease, also known as glucocerebrosidase deficiency.  It is a rare recessively inherited metabolic disorder that results from a genetic deficiency of a lysosomal enzyme acid which breaks down glucosylceramide, a key component of the lipid structure of cell membranes. Individuals with Gaucher Disease have insufficient glucosylceramide degradation, leading to accumulation of large quantities of this lipid within the lysosomes of macrophages.  This leads to widespread secondary pathology, such as bone marrow infiltration, osteonecrosis, bone pain and bone crises, osteopenia and osteoporosis, pathological fractures, growth impairment, and multiple myeloma.  Untreated individuals

3

with Gaucher Disease are at approximately 37.5 percent increased risk of multiple myeloma, a form of cancer.

Treatment with enzyme replacement therapy, such as with Cerezyme produced by defendant Genzyme Corporation ("Genzyme"), reduces the risk and severity of secondary pathologies, including the incidence of multiple myeloma. Cerezyme was approved by the FDA in 1994, and since then, more than 5,600 patients in 90 countries have been treated with it. It is the only therapy with a seventeen-year history of reducing, relieving, and reversing many of the symptoms and risks of Type 1 Gaucher Disease. Once placed on treatment, patients are advised to never go off enzyme replacement therapy because the disease is progressive.

Gregory Reich was diagnosed with the disease over 21 years ago. He was placed on Cerezyme treatment in 1991[1] at 60 units/kg injected every two weeks, which was billed at a rate of over $500,000 per year. Defendant Accredo Health Group ("Accredo") distributed the Cerezyme, and defendant CuraScript, Inc. ("CuraScript") was the billing entity.[2] (Docket No. 31 at 9, ¶ 48).

Sometime prior to July 2009, Genzyme's bioreactors in which Cerezyme and another biologic (Fabrazyme) are manufactured were discovered to be contaminated with vesivirus. As a result, its sole Cerezyme manufacturing facility was shut down to

---

[1]The pleading, however, previously stated that Cerezyme was FDA approved in 1994.

[2]Accredo and CuraScript, however, note in their motion that they are "specialty pharmacies" which provide specialty pharmacy and pharmacy-related services for patients with certain complex, rare, and chronic health conditions. They are both currently owned by Express Scripts Holding Company, but at the time of the events relevant to this action, they were unaffiliated competitors. (Docket No. 43 at 1, n.1).

4

be sanitized, causing an interruption in production.  See Docket No. 31-2 at 2.   In

addition to the vesivirus, vials of Cerezyme were also contaminated with glass, rubber,

and steel particles which plaintiffs allege were known to be toxic to humans, "leading to

complications including pulmonary thrombi and micro-emboli, infusion phlebitis, and

end-organ granuloma formation and inflammation."  (Docket No. 31 at 6, ¶ 29).

Having shut down the bioreactors to be decontaminated, Genzyme could not

meet global customer demand for Cerezyme, and it thus implemented a plan to ration

the remaining Cerezyme inventory until production and shipments returned to normal.

Genzyme organized an ad hoc committee, the Cerezyme Stakeholders Working Group

("CSWG"), allegedly comprised of Genzyme employees and affiliates.  The CSWG did

not include plaintiff Gregory Reich or the thousands of other patients, their legal

representatives, doctors, or rabbinical counsel and allegedly was a "sham organization"

solely functioning as an instrumentality of Genzyme without recognized legal, medical,

or governmental authority in the United States or Colorado.  Neither Genzyme nor the

CSWG sought third-party accreditation under FDA regulations to override multiple

safety protocols as well as state and federal statutes designed to protect patients from

"filthy drugs and involuntary medical experimentation."  (Docket No. 31 at 12, ¶¶ 63, 64).

The CSWG issued guidance, subsequently revised, to the U.S. Gaucher

Community concerning the conservation of the remaining Cerezyme inventory during

the shortage.  (See Docket No. 31-2, Pls.' Ex. B).  The revised guidance listed those

patients who were considered to be the most vulnerable and critically ill who should

continue to receive Cerezyme without any interruption, provided information about an

emergency access program, noted that all patients receiving Cerezyme during the

period of temporary shortage should be considered for individualized dose reductions, indicated that patients receiving dose reductions or treatment interruptions should be monitored and have clinical data collected and entered into a registry, and noted that those undergoing treatment interruptions may be candidates for clinical trials or treatment protocols using alternative investigational therapies.  (Docket No. 31-2 at 2). Plaintiffs assert that although Genzyme termed the CSWG's recommendations as "guidelines," Genzyme converted them to mandatory medical treatment protocols that trumped individual physician's independent judgment, including Gregory Reich's treating physician.  Plaintiffs contend that such conduct constitutes the unauthorized "practice of medicine" without a license in violation of Colorado law, § 12-36-106(2), C.R.S.

Accredo and CuraScript distributed and billed for Cerezyme and participated in the national sales and marketing of "diluted, untested, and ineffective medication substitute" (the reduced dosages) by acting as a "middle-man" identifying which patients to target for the reduced dosage, referring to them as "Group 2" patients.  "Group 1" patients received full doses, but they were also injected with the vesivirus.  Accredo and CuraScript contacted patients' physicians to obtain private medical information to target "Group 2" patients who would received reduced dosages.  Accredo and CuraScript classified Gregory Reich as a "Group 2" patient and submitted this information to Genzyme.  He was thus was one of the many patients who received fewer vials than had been shipped prior to the rationing.  More specifically, he received the impure, reduced dosage on at least seven dates: January 4, 11, and 18, 2010, February 12, 2010, March 23, 2010, April 15, 2010, and March 7, 2011.

Plaintiffs describe the reduced-dosage Cerezyme containing the vesivirus and

6

contaminants as an "experimental drug" (Docket No. 31 at 5, ¶ 19).  Plaintiffs claim it

was illegal to sell and market this biologic because it was "experimental, mislabeled,

impure, filth contaminated, ineffective, diluted, and illegally substituted but marked as if

it were a beneficial treatment for Gaucher Disease despite never having been

previously tested in animals, or gravely ill human beings."  (Docket No. 2 at 5, ¶ 21).  In

addition, they claim that all defendants refused to honor physicians' requests to opt out

of being injected with the adulterated reduced dosages even after the treating physician

determined that a patient was deteriorating and was at high risk of sequela, thereby

undertaking involuntary medical experimentation on humans without expert guidance or

informed consent.  Defendants did not revise the product labels to indicate the biologic

was impure or contaminated and was administered at less than the recommended

dosage or warn of any risk of injury.

Regarding the incident that caused the shortage, the company was quoted in the

Boston Globe as stating that "[w]hile the virus has the ability to taint the drugs, it is not

considered harmful to humans."  According to plaintiffs, however, since no research

existed on the effects of injecting humans with vesivirus, the statement was materially

false and misleading, resulting in the involuntary injection of thousands of patients with

the pathogen.  Plaintiffs characterize this as "medical experimentation on the effects of

intravenous vesivirus injections on human beings."  (Docket No. 31 at 6).  Plaintiffs

claim that "[v]esivirus causes infectious disease in humans with observations of viremia,

vesicular skin lesions, antigenicity, antibody seroconversion, hepatitis, and potentially

inducing abortions."  (Docket No. 31 at 6, ¶ 27).  Genzyme allegedly was aware of the

dangers of vesivirus prior to its statements to the contrary and "decided to involuntarily

inject patients with contaminated Cerezyme anyway." (Docket No. 31 at 6 ¶ 28).  In addition, according to plaintiffs, Genzyme and CSWG concealed previously published experiments showing the dangers of diluted dosing causing disease progression and risk of disease sequela.

Plaintiffs liken Genzyme's rationing of its limited stock of Ceryzme (and another product, Fabrazyme) among over 8,000 patents worldwide during the temporary plant shutdown to the use of 7,000 Jewish people for medical experimentation purposes during World War II in Germany and the use of 600 African American experimental subjects during the Tuskegee Syphilis experiments from the 1930s to 1960s. (Docket No. 31 at 21).  They contend that it was a federal crime to introduce the product into commerce.  They describe defendants' acts as a "fraudulent scheme" that utilized the mail and wires.  (Docket No. 31 at 21).

Plaintiffs allege that due to "the conduct of the defendants," Gregory Reich suffered from glucocerebroside deposition, developed multiple myeloma and skin lesions, has had bone deterioration, excisional bone surgery, and chemotherapy, has lost the ability to walk without assistance, and suffers from chronic pain.  He has been forced to sell his stake in a private periodontal business.

Plaintiffs raise class allegations as well as the following eleven claims: (1) negligence, (2) negligence *per se*, (3) strict liability, (4) breach of warranty, (5) tortious interference with a physicans/patient relationship, (6) RICO (the "CSWG Enterprise"), (7) RICO (the "GROUP 2 Enterprise"), (8) intentional/negligent misrepresentation; (9) Colorado Consumer Protection Act ("CCPA") violation; (10) unjust enrichment, and (11) loss of consortium.

## MOTIONS TO DISMISS

Genzyme seeks dismissal pursuant to Rule 12(b)(6) on the following grounds: (1) the RICO, misrepresentation, and CCPA claims fail to comply with Rule 9(b); (2) the RICO claims have no place in this litigation given the indisputable facts of this case; (3) the civil RICO claims fail as a matter of law because neither counts adequately allege the existence of an enterprise, a sufficient RICO "pattern" because the Cerezyme shortage was unintentional and short-lived, the predicate acts of racketeering, and proximate cause; (4) the state claw claims fail as there is no cognizable duty by Genzyme to Gregory Reich to manufacture Cerezyme, (5) none of the alleged violations of federal or state law can support plaintiffs' claims for negligence *per se*, (6) there is no claim for tortious interference with a physician-patient relationship under Colorado law, (7) the CCPA claim fails because plaintiffs cannot allege any unfair or deceptive trade practice significantly impacted the public, (8) the unjust enrichment claim fails because plaintiffs have not adequately alleged the "benefit" conferred upon Genzyme by plaintiff, and (9) plaintiffs' class allegations should be stricken as a matter of law.

Accredo and CuraScript also seek dismissal pursuant to Rule 12(b)(6).  They assert that pursuant to the Colorado "innocent seller" statute, non-manufacturers like Accredo and CuraScript cannot be liable under a product liability theory, and thus none of plaintiffs' product liability claims against them (i.e., the negligence, negligence *per se*, warranty, and strict liability claims) can proceed.  In addition, they agree with Genzyme's arguments as to why the non-product liability claims should be rejected, and with one partial exception, join them.  They assert they had no duty to provide Gregory Reich with an amount of the product that could not be supplied, given that they had no

capacity to make Cerezyme in the first place. Furthermore, with respect to plaintiffs'

suggestion that Accredo and CuraScript were negligent because they failed to warn

Gregory Reich of some aspect of the Cerezyme shortage management program, the

Amended Complaint is perfectly clear that the Reichs and Gregory Reich's physician

were well aware that Gregory Reich would be receiving a reduced dose of the

medication. Third, they contend that the claim for tortious interference with a physician-

patient relationship must be dismissed because such a tort is not recognized in

Coloardo. Fourth, in addition to the arguments asserted by Genzyme, the RICO claims

against Accredo and CuraScript also must be dismissed because there is no allegation

that they participated in the operation or management of the purported RICO

enterprises. Fifth, the CCPA claims must be dismissed because, in addition to the

argument that they are not pled with adequate particularity, there is no allegation that

the Reichs relied on or otherwise were induced to change their conduct based on any

misrepresentation by Accredo and CuraScript, and the CCPA was not intended to apply

where a discrete number of consumers is affected. Sixth, the unjust enrichment claim

fails because the Reichs do not seek equitable relief; they seek legal damages and

have pled theories that if successful would result in that recovery. Finally, their loss of

consortium claim must be dismissed because it is a derivative action and cannot survive

if the other claims are dismissed.

Under Rule 8(a)(2), a pleading must contain "a short and plain statement of the

claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion to

dismiss pursuant to Rule 12(b)(6) alleges that the complaint fails "to state a claim upon

which relief can be granted." Fed. R. Civ. P. 12(b)(6). "A complaint must be dismissed

10

pursuant to Fed. R. Civ. P. 12(b)(6) if it does not plead 'enough facts to state a claim to relief that is plausible on its face.'" Cutter v. RailAmerica, Inc., 2008 WL 163016, at *2 (D. Colo. Jan. 15, 2008) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." Bell Atlantic Corp., 550 U.S. at 555 (citations omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level." Id.  "[A] plaintiff must 'nudge [] [his] claims across the line from conceivable to plausible' in order to survive a motion to dismiss. . . . Thus, the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting Bell Atlantic Corp., 127 S. Ct. at 1974).

The Tenth Circuit Court of Appeals has held "that plausibility refers to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible." Khalik v. United Air Lines, 671 F.3d 1188, 1191 (10th Cir. 2012) (internal quotations omitted).  The Circuit court has further "noted that '[t]he nature and specificity of the allegations required to state a plausible claim will vary based on context.'" Id.  The court thus "concluded the *Twombly/Iqbal* standard is 'a wide middle ground between heightened fact pleading, which is expressly

rejected, and allowing complaints that are no more than labels and conclusions or a formulaic recitation of the elements of a cause of action, which the Court stated will not do.'" Id.

For purposes of a motion to dismiss pursuant to Rule 12(b)(6), the court must accept all well-pled factual allegations in the complaint as true and resolve all reasonable inferences in the plaintiff's favor. Morse v. Regents of the Univ. of Colo., 154 F.3d 1124, 1126-27 (10th Cir. 1998); Seamons v. Snow, 84 F.3d 1226, 1231-32 (10th Cir. 1996). However, "when legal conclusions are involved in the complaint 'the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to [those] conclusions' . . . ." Khalik, 671 F.3d at 1190 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009)). "Accordingly, in examining a complaint under Rule 12(b)(6), [the court] will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." Id. at 1191.

The court notes that plaintiffs reference a "co-pending" case in their pleading, Hochendoner v. Genzyme, No. 1:11-cv-10739-DPW (D. Mass.). (See Docket No. 31 at 7). That case concerns claims raised by patients with a different disease who were prescribed Fabrazyme, manufactured by Genzyme in the same plant as Cerezyme, which was similarly in temporary short supply as a result of the plant being shut down to be sanitized. During that shortage, Genzyme adopted a similar rationing plan for Fabrazyme under which patients would be allocated less than the recommended dose, and newly-diagnosed patients would not be prescribed the drug. Here, after the motions to dismiss were briefed, Genzyme filed a Notice of Supplemental Authority

(Docket No. 62) regarding a recent opinion by Judge Douglas P. Woodlock in that

Massachusetts action, Hochendoner v. Genzyme Corp., 2015 WL 1333271 (D. Mass.

Mar. 25, 2015).  While Judge Woodlock's ruling is not controlling here, as set forth in

more detail below, the court finds his ruling to be persuasive on similar issues raised in

the instant motions to dismiss.

**Minimum Pleading Standards.**   Here, the court finds that the Amended

Complaint is quite prolix, obfuscatory, and convoluted.  It does not comply with Rule

8(a)(2) as it does not contain "a short and plain statement of the claim showing that the

pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Furthermore, it does not comply

with Rule 8(d)(1), which requires that "[e]ach allegation must be simple, concise, and

direct."  Fed. R. Civ. P. 8(d)(1).

For example, plaintiffs did not use clear, uniform terminology to describe Gregory

Reich's not receiving the same dosage/number of vials of Cerezyme during the

shortage as he received pre-shortage.  Instead, throughout the Amended Complaint

plaintiffs repeatedly and interchangeably used other convoluted terminology such as

"diluted," "medication substitute," "substitute medication," "drug substitutions," "drug

substitute," "ineffective drug substitute," "off-label use," and "adulteration."   During oral

argument, however, plaintiffs' counsel responded to the court's inquiry about the various

terminology used and essentially confirmed that the product shipped during the

rationing was not diluted in volume (what counsel described as "volumetric dilution") or

substituted with a product other than Cerezyme.  Rather, plaintiffs are alleging that

during the shortage Gregory Reich received fewer vials of Cerezyme which resulted in a

dose less than the 60 units/kg he had been receiving bi-weekly before the shortage.

13

Their counsel called this "under-dosing," which he described as actions that caused the

biologic to be below the standard of care.[3]   Counsel further described this in oral

argument as an "ineffective treatment" because it "reduced the therapeutic effect."  He

clarified "substitution" as Accredo and CuraScript putting in less than the "correct"

number of bottles (vials) of Cerezyme in the shipping container; in other words, once

again, that Gregory Reich was shipped a reduced dosage of Cerezyme.  Furthermore,

plaintiffs' counsel defined "dilute" as "reduce the therapeutic effect."  Regardless of the

labels plaintiffs use, the basis of all of their claims is their allegation that Gregory Reich

received a reduced dosage (fewer vials) of Cerezyme during the rationing period

compared to what he received prior to the Cerezyme shortage.

While the Amended Complaint contains allegations about contaminants in the

Cerezyme distributed by defendants during the shortage (namely, vesivirus and

particles - glass, rubber, and steel), their pleading does not state a claim of injury as a

---

[3]In the Amended Complaint and during oral argument, plaintiffs reference an exhibit attached to their pleading (Docket No. 31-3), which is a letter address to "Dear Patient," dated 7-14-2009, from a Dr. Jonathan Bernstein.  The letter states,

> I am writing to you in response to the recent event resulting in shortage of your IV medication Fabrazyme or Cerezyme.  It is my firm understanding that treatment with enzyme replacement medications are only beneficial at doses studied.  Any less than recommended, the dosing results in an inadequate therapeutic treatment.  I will not be changing your prescription, decreasing your dosing, or asking that you skip any does of enzyme replacement treatments.  If you have any questions, please call me at my office.

(Docket No. 31-1).  There is no allegation in the Amended Complaint, however, that Dr. Berstein was Gregory Reich's physician.  Nevertheless, plaintiffs use this letter to establish the standard of care for Gaucher patients and to support their assertion that Gregory Reich's receipt of the reduced dosage was below the standard of care they seem to attribute to the defendants.

14

result of such contaminants.  Instead, plaintiffs merely list various complications that generally may result from such contaminants.  For example, they contend that the particles are known to be toxic to humans, "leading to complications including pulmonary thrombi and micro-emboli, infusion phlebitis, and end-organ granuloma formation and inflammation."  (Docket No. 31 at 6, ¶ 29).  Regarding vesivirus, they contend that it "causes infectious disease in humans with observations of viremia, vesicular skin lesions, antigenicity, antibody seroconversion, hepatitis, and potentially inducing abortions."  (Docket No. 31 at 6, ¶ 27).

Significantly lacking is any well-pled factual allegation that Gregory Reich has been injured by such contamination.  Instead, plaintiffs assert that "[d]ue to the conduct of the Defendants, [Gregory] REICH has been physically injured having suffered from glucocerebroside deposition, from having developed multiple myeloma, from having had bone deterioration, from having had excisional bone surgery, from having undergone chemotherapy, from having lost the ability to walk without assistance, from having developed skin lesions and from having suffered (and continuing to suffer) chronic pain."  (Docket No. 31 at 18, ¶ 102).  Those purported injuries, however, do not on their face include any of the possible complications of the contaminants that were previously alleged in their pleading.

"A complaint must set forth sufficient facts to elevate a claim above the level of mere speculation."  Humood v. City of Aurora, Colo., 2014 WL 4345410, at *6 (D. Colo. Aug. 28, 2014) (citing Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)).  Therefore, to the extent plaintiffs may be attempting to make a claim of injury caused by contaminants (vesivirus and particles) that may have been in some or all of the

15

Cerzyme shipped to Gregory Reich during the shortage, which was from the remaining Cerzyme inventory when the factory was shut down, such claim should be dismissed. See Hochendoner, 2015 WL 1333271, at *7 (plaintiffs' claims regarding contaminants of particulate steel, glass, and rubber failed).

Furthermore, throughout their pleading, plaintiffs improperly refer to the defendants collectively rather than clarifying which acts each defendant is alleged to have committed to give rise to the various claims against them.

Because of the poor drafting of the pleading, the court has had to wade through it numerous times in order to address defendants' motions to dismiss.  Based on the findings below, however, the court does not recommend that plaintiffs be granted leave to file a Second Amended Complaint that cures their inartful pleading.

**Tortious Interference With a Physician-Patient Relationship (Claim V).**  The court agrees with the defendants that Claim VI should be dismissed because Colorado law does not recognize a cause of action for tortious interference with a physician-patient relationship.

**RICO Claims (Claims VI and VII).**  Defendants assert that plaintiffs' RICO claims (Claims VI and VII) fail because plaintiffs have not adequately pleaded the existence of an enterprise, a pattern of racketeering activity, the predicate acts of racketeering, or facts demonstrating proximate causation.  This court agrees substantially for the reasons stated in Genzyme's motion.

"The Racketeer Influenced and Corrupt Organizations Act (RICO) establishes a civil cause of action for persons injured as a result of a prohibited racketeering activity.

18U.S.C. § 1692(c)).”  CGC Holding Co., LLC v. Broad and Cassel, 773 F.3d 1076,

1088 (10th Cir. 2014).  Section 1962(c) of the RICO statute states that “[i]t shall be

unlawful for any person employed by or associated with any enterprise engaged in, or

the activities of which affect, interstate or foreign commerce, to conduct or participate,

directly or indirectly, in the conduct of such enterprise’s affairs through a pattern of

racketeering activity or collection of unlawful debt.”  18 U.S.C. § 1962(c).  To state a civil

RICO claim under this statute, plaintiffs must allege that the defendants: (1) participated

in the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity, CGC

Holding Co., 773 F.3d at 1076; Tal v. Hogan, 453 F.3d 1244, 1269 (10th Cir. 2006), and

(5) an injury-in-fact that was proximately caused by violation of the Act.  See Bixler v.

Foster, 596 F.3d 751, 756 (10th Cir. 2010).

　　　The second RICO element, an “enterprise,” includes any “individual, partnership,

corporation, association, or other legal entity, and any union or group of individuals

associated in fact although not a legal entity.”  18 U.S.C. § 1961(4).  “Despite the

apparent breadth of this definition, to properly plead an enterprise a plaintiff must

alleged three components: (1) that there is ‘an ongoing organization with a decision-

making framework or mechanism for controlling the group,’ (2) ‘that various associates

function as a continuing unit,’ and (3) ‘that the enterprise exists separate and apart from

the pattern of racketeering activity.’”  Kearney v. Dimanna, 195 Fed. Appx. 717, 720

(10th Cir. Aug. 30, 2006) (quoting United States v. Smith, 413 F.3d 1253, 1266-67 (10th

Cir. 2005)).  “[I]t is required that the ‘person’ and the ‘enterprise’ engaged in

racketeering activities be different entities.’ . . .  Thus the plaintiff[s] in a RICO case must

establish that ‘defendants were part of an enterprise which had an existence and

17

purpose distinct from any one of them." George v. Urban Settlement Servs., 2014 WL

4854576, at *8 (D. Colo. Sept. 30, 2014).  "[A] corporation cannot, at the same time be

both a 'person' and an 'enterprise' under RICO."  Prochnow v. Fidelity Mortgage Co.,

2014 WL 4783397, at *5 (D. Colo. Sept. 25, 2014) (quoting Consumers Gas & Oil, Inc.

v. Farmland Indus., 815 F. Supp. 1403, 1411 (D. Colo. 1992)).

Here, the court agrees with defendants that the alleged "SCWG" enterprise

(Claim VI) fails as a matter of law.  As noted by defendants, according to plaintiffs' own

allegations, CSWG is "illusory," a "Genzyme initiated contrivance," and a "sham"

organization fully controlled by Genzyme.  (Am. Compl., Docket No. 31 at ¶¶ 43, 48, 51,

62).  Taking these allegations as true, the court finds that CSWG is indistinct from

Genzyme itself.  As stated above, however, corporate-controlled entity cannot be both

the person who conducts the affairs of the enterprise and the enterprise itself.

Prochnow v. Fidelity Mortgage Co., 2014 WL 4783397, at *5 (D. Colo. Sept. 25, 2014).

See Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 162 (2001).  Therefore,

Claim VI fails.

Plaintiffs raise another RICO claim in Claim VII regarding the "Organization

Creating 'Group 2'."  As noted by defendants, however, plaintiffs simply assert that "[t]he

organization creating 'GROUP 2' is an 'enterprise' which was created and/or used as a

tool to effectuate Defendants' pattern racketeering activity [sic] and enterprise being in-

fact associated with the Defendants, Genzyme, Accredo, and CuraScript."  (Docket No.

31 at 39,  ¶ 168).  The court agrees with defendants that this vague allegation is

insufficient as a matter of law.  Plaintiffs have not specifically identified the requisite

enterprise.  There is no particularity in the pleading which identifies the "organization" by

18

name or with any specificity regarding its existence.

Based on these findings regarding the lack of the requisite "enterprise," and in the interest of judicial economy, the court will not address the other shortfalls of the plaintiffs' RICO claims, which are thoroughly detailed by the defendants in Genzyme's motion.  It is recommended that both RICO claims (Claims VI and VII) be dismissed.

**Innocent Seller Statute.**  The court recommends that the plaintiffs' claims against defendant Accredo and CuraScript that encompass product liability (namely, Claims I - IV – negligence, negligence *per se*, strict liability, and breach of warranty) be dismissed pursuant to Colorado's "Innocent Seller" statute, § 13-21-402, C.R.S.  Neither Accredo nor CuraScript is alleged to be the "manufacturer" of Cerezyme.  <u>See</u> § 13-21-401(1), C.R.S. (defining "manufacturer" as "a person or entity who designs, assembles, fabricates, produces, constructs, or otherwise prepares a product or a component part of a product prior to the sale of the product to a user or consumer.").  Instead, it appears from the Amended Complaint that these two defendants are alleged to have merely distributed the reduced dosage of Cerzyme, processed the billing therefor, and sent correspondence to Gregory Reich's treating physician as a "Cerezyme Prescriber."  That correspondence concerned conservation of the Cerezyme inventory during the temporary shortage.  It requested the doctor's completion of a form concerning placement of his patients in "Group 1" ["Most vulnerable patients"] or "Group 2" [Less vulnerable patients"] as well a new prescription detailing the recommended dose reduction if he had a Group 2 patient.  (Docket No. 31-8).[4]

---

[4]Plaintiffs do not attach the "page 3" referenced in the correspondence to the doctor, which seemingly was the new prescription form detailing the recommended

19

Therefore, Accredo and CuraScript are apparently only the "sellers" or distributors of Cerezyme.  <u>See</u> § 13-21-401(3), C.R.S. (defining "seller" as "any individual or entity, including a manufacturer, wholesaler, distributor, or retailer, who is engaged in the business of selling or leasing any product for resale, use, or consumption.").  Colorado's innocent seller statute excludes such non-manufacturer entities from liability under a product liability claim, except in certain circumstances not applicable here.  The statute provides:

> (1) No product liability action shall be commenced or maintained against any seller of a product unless said seller is also the manufacturer of said product or the manufacturer of the part thereof giving rise to the product liability action.  Nothing in this part 4 shall be construed to limit any other action from being brought against any seller of a product.

> (2) If jurisdiction cannot be obtained over a manufacturer of a product or a part of a product alleged to be defective, then that manufacturer's principal distributor or seller over whom jurisdiction can be obtained shall be deemed, for the purposes of this section, the manufacturer of the product.

§ 13-21-402, C.R.S.  "Product liability action" is defined as:

> any action brought against a manufacturer or seller of a product, **regardless of the substantive legal theory or theories upon which the action is brought**, for on account of personal injury, death, or property damage caused by or resulting from the manufacture, construction, design, formula, installation, preparation, assembly, testing, packaging, labeling, or sale of any product, or the failure to warn or protect against a danger or hazard in the use, misuse, or unintended use of any product, or the failure to provide proper instructions for the use of any product.

---

dose reduction.  (Docket No. 31-8).  Very significantly, plaintiffs do not allege in their pleading that the treating physician did not prescribe a reduced dosage for Gregory Reich, whom he designated as a "Group 2" patient.  Plaintiffs merely state that the doctor submitted "Group 2 paper work" and then later objected three times to the rations.  (See Docket No. 31 at 31, ¶ 33 ["Dr. Reich's physician reportedly opposed GENZYME's rations on his patient's behalf three times after submitting the Group 2 paper work."]).

§ 13-21-401(2), C.R.S. (emphasis added).

As noted by defendants, in this case, each of the plaintiffs' first four claims seek consequential damages for injuries allegedly suffered as a result of Gregory Reich receiving a reduced dose of Cerezyme.  This court agrees that the injuries alleged fall under the personal injury umbrella and thus are product liability claims for the purposes of the innocent seller statute.  See Carter v. Brighton Ford, 251 P.3d 1179, 1187 (Colo. App. 2010) ("product liability actions" encompass "those tort actions which seek damages for injuries and collateral damage caused by defective products.").  Therefore, Claims I - IV (negligence, negligence per se, strict liability, and breach of warranty) should be dismissed as to Accredo and CuraScript.  The court finds an alternate basis for dismissal of these claims in the section below.

**Lack of Duty.**  The existence of a duty is one of the basic elements necessary to state any tort claim.  See Vanderloop v. Progressive Cas. Ins. Co. 769 F. Supp. 1172, 1175 (D. Colo. 1991); Delmonico v. Pueblo Community Health Center, Inc., 2007 WL 38383, at *3 (D. Colo. Jan. 4, 2007); Daugherty v. Allstate Ins. Co., 55 P.3d 224, 228 (Colo. App. 2002).  "The question of whether a duty exists is a question of law . . . ." Level 3 Communications, LLC v. Liebert Corp., 535 F.3d 1146, 1163 (10th Cir. 2008).

Here, defendants assert that plaintiffs' claims of negligence (Claim I), negligence per se (Claim II), strict liability (Claim III), breach of warranty (Claim IV), tortious interference (Claim V), misrepresentation (Claim VIII), CCPA (Claim IX), and unjust enrichment (Claim X) are all based upon the faulty legal premise that Genzyme had a duty to ship full-dose Cerezyme to Gregory Reich during the shortage.  Defendants contend that to the extent that these claims rest upon the claim that Genzyme had such

21

a duty to provide Greogry Reich with an uninterrupted supply of his pre-shortage dose of Cerezyme, they fail as a matter of law.

This court agrees and finds that there is no cognizable duty by Genzyme to Gregory Reich to manufacture Cerezyme at all, much less in sufficient quantities so that he may be prescribed any specific amount by his physician.  See Hochendoner, 2015 WL 1333271, at *11 (declining to recognize a new common law tort imposing a duty to produce patented medication and dismissing claims of negligence, negligence *per se*, strict liability, breach of warranty, and violation of consumer protection acts and state product liability acts); Schubert v. Genzyme Corp., 2013 WL 4776286, at *3-4 (D. Utah Sept. 4, 2013) ("There is no federal law requiring a manufacturer to produce amounts sufficient to meet all potential demand.  In such a heavily regulated industry, if such a duty was deemed necessary, the governing regulators would have imposed it."); Lacognata v. Hospira, Inc., 2012 WL 6962884 (M.D. Fla. July 2, 2012) (holding that there is no duty to manufacture an adequate supply of a drug to meet market demand), aff'd, 521 Fed. App'x 866 (11th Cir. 2013), cert. denied, 134 S. Ct. 458 (2013). Accordingly, it is recommended that to the extent these claims are based on such a duty, such claims should be dismissed as a matter of law.

Furthermore, with respect to Accredo and CuraScript, plaintiffs have not pled a plausible duty that might have been breached by these two defendants.  Plaintiffs have not alleged that Gregory Reich's physician did not prescribe the reduced dosage recommended for the Group 2 patients.  They merely note that he later objected three times to the rations.  (See note 4 *supra*).  There is no allegation that Accredo and CuraScript did not deliver the amount prescribed.  There is no allegation that they

concealed from plaintiffs that Gregory Reich was part of the reduced dosage population.

In addition to asserting the lack of duty (discussed above), the motions to dismiss detail the alleged legal inadequacies of the remaining claims.  The court, however, will not address them because it finds the reasoning as to such claims set forth by the Hochendoner court to be persuasive, and for the reasons stated therein, finds that plaintiffs have failed to state claims upon which relief may be granted.  Hochendoner, 2015 WL 1333271 (dismissing claims of negligence, negligence *per se*, strict liability, breach of express and implied warranty, misrepresentation, and consumer protection and product liability law, including failure to warn).

The court notes that in its ruling, the Hochendoner court made reference to the FDA package insert for the drug at issue in that case, noting the dosing directions.  In this case, the package insert for Cerezyme, which is attached to the Amended Complaint (Docket No. 31-1), states the following regarding dosing instructions:

**DOSAGE AND ADMINISTRATION**

**Cerezyme**[r] (imiglucerase for injection) is administered by intravenous infusion over 1-2 hours.  Dosage should be individualized to each patient, initial dosages range from 2.5 U/kg of body weight 3 times a week to 60 U/kg once every 2 weeks.  60 U/kg every 2 weeks is the dosage for which the most data are available.  Disease severity may dictate that treatment be initiated at a relatively high dose or relatively frequent administration.

Dosage adjustments should be made on an individual basis and may increase or decrease, based on achievement of therapeuti goals as assessed by reoutine comprehensive evaluations of the patient's clinical manifestations.

(Docket No. 31-1) (emphasis added).  Significantly, the language does not dictate a certain dosage, such as the particular dosage Gregory Reich received pre-shortage.

Furthermore, this language specifically states that the dosage plaintiff received pre-shortage was merely the "dosage for which the most data are available."  None of the language creates a plausible claim that defendants made any express or implied warranty or any misrepresentation regarding the efficacy of Cerezyme at any particular dosage.  As in Hochendoner, "Plaintiffs offer no case law in support of the proposition that if a merchant has available only a limited amount of a product, the merchant is impliedly warranting that the limited amount will be as powerful or effective as a greater amount."  Hochendoner, 2015 WL 1333271, at *13.  Plaintiffs have not pled any specific misrepresentations made by defendants regarding the efficacy of the reduced dosage.  In sum, the facts alleged here do not state a breach of warranty or misrepresentation claim that is plausible on its face.

**Unjust Enrichment (Claim X).**  In Claim X, plaintiffs assert a claim of unjust enrichment against all three defendants.  Plaintiffs assert that Gregory Reich, his subrogators, and all others similarly situated have conferred a benefit to the three defendants by purchasing the reduced dosage of Cerezyme for Gaucher Disease and prevention of sequela, that defendants have retained the benefit despite having conferred no benefit and conferred a detriment based on defendants' acts, which misled patients and concealed the true nature and medical risks of the reduced dosage.  Plaintiffs contend that given the facts alleged, it would be unjust to allow defendants to retain the benefits of the sale and distribution of the reduced dosage of Cerezyme.  (Docket No. 31 at 45-46).  Plaintiffs' counsel asserted at oral argument that defendants should not have charged patients for the reduced doses of Cerezyme.

"To state a claim for unjust enrichment, a Plaintiff must allege facts showing (1)

the defendant received a benefit, (2) at the plaintiff's expense, (3) under circumstances that would make it unjust for the defendant to retain the benefit without compensating the plaintiff." Hottinger Excavating & Ready Mix, LLC v. R.E. Crawford Construction, LLC, 2014 WL 6461350, at * 6 (D. Colo. Nov. 18, 2014) (citing Sterenbuch v. Gross, 266 P.3d 428, 437 (Colo. App. 2011)). See Arapahoe Surgery Center, LLC v. Cigna Healthcare, Inc., 2015 WL 1041515, at *8 (D. Colo. March 6, 2015) (To state a claim of unjust enrichment, plaintiffs must allege "that the defendant[s] knowingly received a benefit at the plaintiff's expense that it would be unjust for the defendant[s] to retain.") (citing Lewis v. Lewis, 189 P.3d 1134, 1141 (Colo. 2008); Hill v. Cross Country Settlements, LLC, 936 A.2d 343, 351 (Md. 2007)). Here, the court finds that plaintiffs have failed to put forth sufficient facts to state a claim for unjust enrichment. Plaintiffs do not allege that defendants concealed the fact that Group 2 patients, such as Gregory Reich, would not be receiving the same amount of Cerezyme as they had received prior to the shortage. Plaintiffs have not alleged any specific facts regarding defendants misleading physicians (and patients) that receiving a reduced dosage would have the same effectiveness. In fact, plaintiffs allege that Gregory Reich's own doctor protested the ration, which suggests that the doctor was aware that receiving a reduced dosage may not be as effective.

**Loss of Consortium (Claim XI).** The last claim, loss of consortium (Claim XI), is a derivative claim which cannot survive without the underlying claims. Therefore, based upon the findings above concerning Claims I to X, it is recommended that this claim be dismissed.

**Class Allegations.**  The court has not yet certified a class under Fed. R. Civ. P.

23.  Indeed, no motion for class certification has been made.  Plaintiffs' representative

capacity therefore remains possible but far from actual.  See Gates v. United Healthcare

Ins. Co., 2014 WL 5800573, at *12 (S.D.N.Y. Nov. 7, 2014).  Based upon the findings

and recommendations above with respect to plaintiffs' failure to state a claim upon

which relief may be granted as to their individual claims, the court finds that plaintiffs

cannot fairly and adequately protect the interests of the class or present claims or

defenses that are typical of the claims and defense of the class.  See Dollison v.

American Nat. Ins. Co., 2013 WL 1944891, at * 9 (N.D. Okla. May 9, 2013) ("Dismissal

of all counts over which plaintiff sought class certification precludes plaintiff's

representation of a class of persons similarly situated.  In other words, pursuant to Fed.

R. Civ. P. 23(a), if plaintiff is unable to state a claim upon which relief may be granted as

to her claims, she cannot 'fairly and adequately protect the interests of the class' or

present 'claims or defenses' that are typical of the claims and defense of the class.").

See also Schweizer v. Trans Union Corp., 136 F.3d 233, 239 (2d Cir. 1998) ("There is

nothing in Rule 23 which precludes the court from examining the merits of plaintiff's

claims on a proper Rule 12 motion to dismiss or Rule 56 motion for summary judgment

simply because such a motion precludes resolution of the issue of class certification.").

Therefore, it is recommended that the class allegations also be dismissed.

**WHEREFORE,** for the foregoing reasons, it is hereby

**RECOMMENDED** That Accredo Health Group, Inc. and CuraScript, Inc.'s Rule

12(b)(6) Motion to Dismiss Plaintiffs' Amended Complaint (Docket No. 43) be

**GRANTED**.  It is further

**RECOMMENDED** that Defendant Genzyme Corporation's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) (Docket No. 44) be **GRANTED**.

**NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case.  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  The District Judge need not consider frivolous, conclusive, or general objections.  A party's failure to file and serve such written, specific objections waives *de novo* review of the recommendation by the District Judge, <u>Thomas v. Arn</u>, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions. <u>Makin v. Colorado Dep't of Corrections</u>, 183 F.3d 1205, 1210 (10th Cir. 1999); <u>Talley v. Hesse</u>, 91 F.3d 1411, 1412-13 (10th Cir. 1996).**

Dated: August 14, 2015                s/ Michael J. Watanabe
    Denver, Colorado                 Michael J. Watanabe
                               United States Magistrate Judge